**ROBERTS & PORTER, INC., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 13680.**

United States Court of Appeals
Seventh Circuit.

Sept. 28, 1962.

Tim G. Lowry, Gerhard E. Seidel, Herbert C. Loth, Jr., Chicago, Ill., for petitioner.

Louis F. Oberdorfer, Richard J. Heiman, Lee A. Jackson, Meyer Rothwacks, John B. Jones, Jr., Washington, D. C., for respondent.

Before HASTINGS, Chief Judge, and DUFFY and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Pursuant to the provisions of the 1954 Internal Revenue Code, § 7483, 26 U.S.C.A. § 7483, petitioner, Roberts & Porter, Inc., seek review of a decision of the Tax Court (37 T.C. No. 3, Tax Court Docket No. 83515) to redetermine an income tax deficiency for 1956.

The facts are undisputed. Roberts & Porter sold 40 (out of an authorized 75) $1,000 par, 6%, 10-year, convertible notes to Hugh R. Adams, Jr., then president and the largest stockholder of Roberts & Porter. At any time, at the option of the holder, each of these 40 notes was convertible into six shares of Roberts & Porter common stock, or ten shares of preferred stock. The notes were callable on not less than 30 days', nor more than 60 days', notice, at 106% during the first 7 years, or at face value thereafter, plus accrued interest, but could be called only on an interest payment date, i. e., March 1st or September 1st.

In authorizing the issue of these notes, on August 28, 1952, the Board of Directors and shareholders of Roberts & Porter had limited their sale to six named shareholders and employees. It was a long established policy at Roberts & Porter to keep the controlling shares in the hands of active employees.

On September 1, 1952, Hugh R. Adams, Jr., Harry H. Grandt, and Herve W. Surrey, all principal officers of Roberts & Porter, who together owned 75% of the issued and outstanding stock, and Roberts & Porter, Inc., itself, entered into an agreement (superseding a similar prior agreement) that, on the death or cessation of employment of any of the three officers, or his wish to sell his shares, the other parties to the agreement would purchase his shares at book value

at the end of the month following his death, retirement, or notice of sale. The agreement defined "book value" to include only the cash surrender value, and not the proceeds, of any life insurance policy payable to Roberts & Porter on the death of the officer concerned. The agreement made no reference to the convertible notes.

On August 12, 1956, Mr. Adams died owning the 40 notes mentioned above. Before the end of the month following his death, Mr. Grandt and Mr. Surrey converted the 24 notes which they owned into 144 shares of common stock. Eleven of the authorized 75 notes had never been sold. This left 1,144 shares of common stock issued and outstanding. Of these, 343 shares of the common stock belonging to the late Mr. Adams were subject to the buy-and-sell agreement previously described. Mr. Adams' remaining 50 shares were subject to another agreement, to which Roberts & Porter was not a party, under which Mr. Grandt was entitled to purchase them.

Roberts & Porter, Mr. Grandt and Mr. Surrey, after at arms' length bargaining, arrived at a settlement with the executor of the Adams estate whereby they agreed to buy the 343 shares at $490.68 each, and the 40 convertible notes for $117,763.20, plus accrued interest. If the 40 notes had been converted into 240 shares of common stock, and each share were valued at $490.68, the total value would be $117,-763.20. However, the 40 convertible notes were not subject to the buy-and-sell agreement described above, and the true book value of the 240 shares reserved for conversion of the notes would have been much higher. On Mr. Adams' death, Roberts & Porter received life insurance proceeds of $175,000. The cash surrender value used in computing the "book value" under the buy-and-sell agreement was only $10,212.97. In the course of negotiations, the executor of the Adams estate had at one time taken the position that book value of each share of common stock into which the notes might be converted ought to be $702.60 based on the 1,144 shares then outstanding instead of $609.75 based on the 1,384 shares which would have been outstanding after conversion of the 40 notes if they had been converted. In the absence of the settlement, the executor might have converted the Adams notes into 240 shares having a book value of $609.75 each, or a total of $146,340.00, which he could have sold to a total stranger. Thus the price paid to purchase the 40 notes was lower than the actual book value of the 240 common stock shares into which the notes might have been converted.

In its 1956 income tax return, Roberts & Porter deducted as an expense the premium of $77,763.20 paid to the Adams estate to acquire the notes for which Roberts & Porter had received only $40,000 at the time of their issue. The Commissioner disallowed the entire deduction. The Tax Court allowed the difference between the face amount of the notes and the call price of 106% or $2,-400. Roberts & Porter paid the asserted tax deficiency of $39,188.86, plus interest, and now seeks refund.

Roberts & Porter rely on § 162(a), 1954 Internal Revenue Code, 26 U.S.C.A. § 162(a), which provides for deductions of ordinary and necessary business expense, and its supplementary Treasury Regulation on Income Tax (1954 Code), § 1.61–12, Income From Discharge of Indebtedness:

"(c) Sale and purchase by corporation of its bonds.

"(1) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, *the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year.* If, however, the corporation purchases any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is income for the taxable year." [Emphasis added.]

Roberts & Porter point out that this is merely the latest in a long line of nearly identical regulations beginning with the Revenue Act of 1918.

In U. S. v. Kirby Lumber Co., 284 U.S. 1, at page 3, 52 S.Ct. 4, 76 L.Ed. 131 (1931), Mr. Justice Holmes, speaking for the Court said:

> "We see no reason why the Regulations should not be accepted as a correct statement of the law."

In that case, the Court held that Kirby Lumber Co. realized taxable income on the purchase of its bonds for less than the issuing price.

The Kirby case was cited with approval in San Joaquin Light & Power Corp. v. McLaughlin, Collector of Internal Revenue, 9 Cir., 1933, 65 F.2d 677, at page 680, where the Court said:

> "If it is doubtful under the Revenue Act of 1921 * * * how these amounts of discount and premium so paid should be treated, the doubt is set at rest by the * * * rule of the Treasury Department * * * applicable to the sale and retirement of bonded indebtedness. The rule is reasonable; it has been acted upon for many years, and has been tacitly approved by Congress by repeatedly re-enacting all the provisions of the revenue act here involved without substantial change, and has been expressly approved by the Supreme Court * * * [citing Kirby]."

There the Court sustained the corporation's contention that it incurred a deductible expense in buying its bonds at a premium.

The Commissioner's position is that Roberts & Porter purchased $40,000 of its convertible notes, which by the terms of the notes could be redeemed prior to maturity date for $42,400, and paid sums far in excess of the contract redemption price solely to prevent the holder from exercising the conversion privilege lest the common stock, into which the notes might be converted, fall into the hands of strangers to the business. Therefore, the Commissioner argues, the payment sought to be deducted did not represent a cost of ending a debt liability, but rather the purchase of a stock interest; and that no gain or loss is realized by a corporate taxpayer when its convertible bonds are converted into stock. It is conceded by the Commissioner that the Regulation here concerned recognizes that under the Internal Revenue Code gain or loss can result to a corporate taxpayer from dealings in its own debt and that the characterization of the debt instrument as a "bond" or "note" is not controlling. But the Commissioner sees no reason for considering the payment here made as any different, for tax purposes, from a payment which might have been made for the 240 shares represented by the conversion feature of the notes, had they been in fact so converted and the shares then sold.

In our opinion, the plain and ordinary meaning of Regulation 1.61–12(c) (1) dictates that Roberts & Porter be allowed its deduction for the difference between the issuing price and the price paid to purchase and retire the notes held by the Adams estate. These notes were not, in fact, converted into stock and the stock then sold. There is no provision in the Code or the Regulations which requires allocation of a part of the total purchase price to the value of the conversion privilege. The Regulation here involved is a long standing one, of whose existence Congress is fully aware. Roberts & Porter remind us that when, in 1950, Congress amended the Internal Revenue Code, 26 U.S.C.A. §§ 113, 125 to eliminate amortization of bond premiums, attributable to the conversion feature of convertible bonds, by the holders of such bonds [see Commissioner of Internal Revenue v. Korell, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108 (1950)]. Congress did not, then or later, eliminate or limit the deduction by an issuing corporation of such part of any premium, attributable to a conversion feature, which the corporation may have paid when repurchasing its own bonds. If this situation represents a breach in our revenue wall, its

repair must be effected by legislative action rather than by judicial interpretation.

The decision and order of the Tax Court is reversed and set aside so that the asserted deficiency (plus interest) paid by Roberts & Porter may be refunded.