**NATIONAL CAN CORPORATION, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 81–2461.

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1982.

Decided Sept. 8, 1982.

Larry D. Blust, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Ernest J. Brown, Dept. of Justice, Tax Div., Washington, D. C., for defendant-appellee.

Before CUMMINGS, Chief Judge, GIBSON, Senior Circuit Judge,* and CUDAHY, Circuit Judge.

CUMMINGS, Chief Judge.

This case is about the tax treatment due a corporation that issues its own stock in order to satisfy the conversion option of its subsidiary's convertible debentures. The parent corporation claims it should be allowed to amortize over the remaining life of the converted debentures the difference between the fair market value of the stock issued and the face value of the debentures, or else be allowed an immediate deduction for the same amount. The district court in a well-written opinion disallowed these deductions. 520 F.Supp. 567 (N.D.Ill.1981). We affirm.

I

The parties stipulated to the facts. National Can Corporation (Can) is a Delaware corporation with its principal place of business in Chicago, Illinois. Can is primarily a manufacturer of metal and glass containers and related products. Can uses the calendar year and the accrual method of accounting for federal income tax purposes and files a consolidated federal income tax return for itself and its subsidiaries. During the years 1967 through 1971, its common stock was listed and actively traded on the New York and Midwest Stock Exchanges.

In early 1967, Can decided to expand its manufacturing overseas by acquiring Clover Industries, Limited (Clover), a British can manufacturer. In order to maximize its debt financing and to comply with the United States Government's voluntary program of limiting the exodus of United States dollars, Can elected to borrow dollars held by Europeans, the so-called eurodollars. However, if Can borrowed the euro-

---

* The Honorable Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

dollars itself, the foreign lenders would be subject to United States withholding tax on the interest paid as well as other possible tax burdens that would make borrowing more difficult. The remedy was to form a subsidiary. By forming a subsidiary to do the borrowing, Can could avoid the adverse tax consequences provided the subsidiary received less than 20 percent of its income from United States sources and was adequately capitalized so that its eurodollar borrowing did not exceed five times its share capital. Many such companies were formed to raise foreign capital, and they came to be known generically as "80/20 corporations" or "International Finance Subsidiaries."[1] In this instance, European tax and regulatory laws made preferable Can's creation of a domestic rather than a foreign subsidiary.

Thus on September 1, 1967, Can organized the National Can Overseas Corporation (Overseas) as a Delaware corporation with authorized capital stock of 2,000 common shares without par value. Later in September 1967, Can purchased all of Overseas' stock for $1,400,000 in cash. Overseas then formed an English subsidiary, which acquired over 90 percent of the common stock of Clover. United States banks provided interim financing to Overseas' English subsidiary for Clover's acquisition. The interim loans were guaranteed by Can and structured to be repaid from the proceeds of a 20-year issue of debentures to be sold by Overseas to foreign holders of eurodollars.

On October 26, 1967, pursuant to a request by Can, the Internal Revenue Service ruled that the proposed issue of debentures by Overseas would be a bona fide indebtedness of Overseas provided they were not held by Can or its affiliates. The I.R.S. also ruled that no withholding of tax would be required from the interest paid by Overseas on the debentures to non-resident aliens or foreign corporations, nor would withholding be required upon their conversion of the debentures into stock, provided Overseas

had no gross income or less than 20 percent of its gross income was derived from sources within the United States. This favorable ruling, however, was limited to tax treatment that would be accorded purchasers of the debentures other than Can or Overseas. The I.R.S. did not waive any arguments regarding the tax treatment due Can or Overseas.

In December 1967, as the final step in its acquisition of Clover, Overseas used underwriters to issue to foreign investors $7,000,000 principal amount of 5⅝ percent convertible debentures payable twenty years from December 1, 1967. Overseas sold the debentures at their face value of $1,000 per debenture, and after paying a 2½ percent commission of $175,000 to the underwriters, realized $6,825,000. Overseas then used the proceeds to repay the interim bank loans which had been used to acquire Clover, to provide working capital for Clover, and to acquire other foreign can-manufacturing operations.

The debentures were redeemable by Overseas between five and twenty years from the date of issuance at a premium starting at 105¼ percent and ratably decreasing to 100 percent. After June 1, 1969, the debentures were convertible into common stock of Can, based upon an exchange rate subject to adjustment to prevent dilution. The initial exchange rate for conversion was $38.50 worth of debentures for each share of Can's common stock, which was approximately 110 percent of the price at which the stock was trading on the New York Stock Exchange on the date the debentures were issued. As a result of a two-for-one stock split, the exchange price became $19.25 debentures per share effective June 3, 1970. The debentures were not subordinated, and those converted into Can common stock were not further convertible, could not be transferred except between Can and Overseas, were not redeemable unless all outstanding debentures were re-

---

1. See Committee on Taxation of International Finance and Investment, Tax Section, New York State Bar Ass'n, *Report on International Finance Subsidiaries*, 28 Tax L.Rev. 439 (1973); Chancellor, *Eurobond Financing*, 24 U.S. Cal.Tax Inst. 345 (1972); Fox, *Financing Foreign Operations Through Domestic Finance Subsidiaries*, 55 Va.L.Rev. 1306 (1969); see also Plaintiff's Post-Trial Brief at 4.

deemed at the same time, and might be cancelled at the direction of the holder (either Can or Overseas).

Can guaranteed Overseas' punctual payments of principal and interest on the debentures and also guaranteed Overseas' obligation to convert the debentures into Can common stock. In support of the conversion guarantee, Can agreed that beginning June 1, 1969, it would have sufficient authorized but unissued or reacquired shares of its stock available and properly registered to satisfy all unexercised conversion rights. Can thus reserved initially 181,818 shares of its authorized common stock for possible issuance upon conversion of the Overseas debentures and listed the shares on the New York and Midwest Stock Exchanges effective upon notice of issuance. Can also filed a statement with the Securities and Exchange Commission registering the shares for possible issuance, which it kept effective during the relevant years.

From 1969 through 1971, many of the holders of the Overseas debentures exercised their right to exchange the debentures for Can common stock. As might be expected, on the dates that most such rights were exercised the fair market value of the stock exceeded the conversion price. Overseas did not hold any stock of Can, so that upon presentation of the debentures for conversion, Can issued its common stock and cash in lieu of fractional shares for the debentures. The excess of the fair market value of the Can common stock issued for Overseas debentures at the time of the exchange (plus cash paid by Can for fractional shares) over the face amount of the Overseas debentures acquired by Can in the exchange is set forth below for each year at issue in this case:

| Year | Fair Market Value of Common Stock Issued on Conversion | Cash in Lieu of Fractional Shares | Total Value Given for Debentures | Face Amount of Debentures Converted | Excess of Fair Market Value of Stock Over Face Amount of Debentures |
|---|---|---|---|---|---|
| 1969 | $7,398,117 | $1,504 | $7,399,621 | $4,232,000 | $3,167,621 |
| 1970 | 1,406,135 | 653 | 1,406,788 | 887,000 | 519,788 |
| 1971 | 349,821 | 314 | 350,135 | 244,000 | 106,135 |
| Total for Three Years: | | | $9,156,544 | $5,363,000 | $3,793,544 |

The debentures received by Can have been retained by it and have not been cancelled or called. Overseas has paid Can interest on the debentures.

For the years 1969 through 1971, Can filed timely consolidated federal income tax returns for itself and its affiliated corporations, including Overseas, and paid the taxes it believed were due. On the returns, Can treated the excess (as shown above) of the market value of the Can common stock over the face amount of the debentures as a premium paid for the acquisition of the Overseas debentures. Can attempted to amortize this amount over the remaining life of the debentures. The I.R.S. disallowed the amortization deductions and assessed additional taxes against Can. Can paid the assessed deficiencies of approximately $500,000 and when the I.R.S. disallowed its recalculated refund claims for approximately $2,000,000, Can brought this suit in the district court.

Can made three alternative contentions regarding each of the tax years. First, Can asserted that the excess of market value of its shares over the face amount of the converted debentures should be deductible from income as an ordinary and necessary business expense pursuant to Section 162 of the Internal Revenue Code of 1954, 26 U.S.C. § 162. Second, Can argued that under Section 171 of the Code, it was entitled to amortize such excess over the remaining life of the debentures as a "bond premium" paid for the debentures. Finally, Can claimed that the discount at which the Overseas debentures would have been sold

had they been issued without the conversion right was amortizable over the life of the debentures as "original issue discount" within the spirit of Code Section 1232. The district court decided against Can on all three claims, and Can has brought this appeal based only on the first two claims.

## II

Can's first argument on appeal is that the difference between the market value of its shares and the face amount of the debentures converted is amortizable "bond premium" under Section 171 of the Code. Section 171(a)(1) provides that "[i]n the case of a [taxable] bond, * * * the amount of the amortizable bond premium for the taxable year shall be allowed as a deduction." Section 171(d) in turn provides that the term "bond" includes "any bond, debenture, note or certificate or other evidence of indebtedness, issued by any corporation and bearing interest * * *." The debentures at issue here are taxable and are "bonds." Thus assuming that Overseas' debentures are still outstanding when held by Can,[2] they fit the premises of the Section 171 deduction.

The amount of the amortizable bond premium is defined in Section 171(b) and more concisely in Treasury Regulations § 1.171–2(a) as "the excess of the amount of the basis (for determining loss on sale or exchange under section 1011) of the bond over the amount payable at maturity or, in the case of a callable bond, the earlier call date." Can argues that its Section 1011 loss basis in the bonds is the same as the fair market value of the Can common stock, plus cash in lieu of fractional shares, given in exchange for the bonds, or $9,156,544 (see above table). Since the amount payable at maturity for the 5,363 debentures is $5,363,-000, Can claims that under the calculation of Section 171(b) it should be allowed $3,793,544 worth of amortizable bond premium.

■ The district court, however, denied the Section 171 deduction based upon the following exclusionary sentence contained in Section 171(b)(1): ·

> In no case shall the amount of bond premium on a convertible bond include any amount attributable to the conversion features of the bond.

The district court quite correctly noted that the "premium" Can claims to have expended here is "attributable to the conversion features of the bond" and to the increased market value of Can's common stock. As it stated, "The decision of certain Eurodollar investors to demand exchange of their bonds for National Can's unissued common stock was caused or brought about by the fact that the bonds they purchased in 1967 contained the privilege to convert. A conversion precipitated by a bondholder pursuant to a pre-existing conversion right is an act caused or brought about by [*i.e.*, attributable to] the right to convert." 520 F.Supp. at 578. Moreover, the amount of the "premium" paid by Can upon conversion was directly attributable to the underlying market value of Can's stock; when the stock price was higher or lower at the time of conversion, Can claimed to have paid a correspondingly higher or lower premium. Common tax sense dictates that Can should be allowed no deduction for an increase in the market value of its stock, but Can nevertheless makes several arguments that the exclusionary sentence is inapplicable in this case.

First, Can argues that the plain language of the exclusionary sentence does not cover the transactions. The exclusionary sentence by its own terms applies only to "convertible" bonds, which Can asserts means bonds that are still convertible in the hands of the one claiming the deduction. The Overseas debentures thus would not come within the exclusionary sentence because by their own terms, once converted they were not further convertible.

The district court implicitly adopted the perhaps more obvious construction that "convertible" describes only a type of

---

2. The Government makes an argument we do not reach that because the converted debentures were no longer convertible and could not be transferred except between Can and Overseas, they should be deemed to be no longer outstanding.

bond—one that may be exchanged for stock sometime during its lifetime—without regard for when or whether the option to convert is exercised. The district court's construction is the more plausible on the supposition that Congress drafts tax statutes to dispense information efficiently by the method of using more general, descriptive language toward the beginning of a sentence with the hope of narrowing the meaning before the end of the sentence.[3] On the other hand, if the adjective "convertible" is read for its fullest meaning of limiting the exclusionary sentence to bonds with outstanding conversion features, we might find it to be evidence that the entire Section 171 deduction is unavailable unless any conversion features are still outstanding, on the principle that the phrasing of an exclusion gives insight into the scope of that from which it is excluded. As discussed below, the corresponding Treasury Regulations limit the Section 171 deduction to bonds in which any conversion option rests with the holder.

But more likely here is that the drafters of Section 171 did not consider this precise question. Had the drafters of the exclusionary sentence seen the ambiguity (and had a majority of the appropriate committee or of the whole Congress been able to agree on which meaning should be adopted), they would have written either (1) "In no case shall the amount of bond premium include any amount attributable to conversion features of the bond" to enact the district court's construction, or else (2) "In no case shall the amount of bond premium on a convertible bond include any amount attributable to the outstanding conversion features of the bond" to adopt Can's posi-tion. Aside from the efficiency of information dispensation and the possibility that Congress meant to limit the entire Section to bonds with conversion features (if any) still unexercised, we can only conclude that the words of the exclusionary sentence, considered without regard for their purpose, might be construed to reach either interpretation.

■ Second, Can argues that the Treasury Regulations and language in a decision of this Circuit have limited the exclusionary sentence of Section 171(b)(1) to transactions where the taxpayer purchases an unexercised conversion feature. In particular, Treasury Regulations § 1.171–2(c) provides: "A convertible bond is within the scope of such section [171] if the option to convert on a date certain specified in the bond rests with the holder thereof."[4] Can contends that if the conversion feature does not rest with the holder of the bond, then the exclusionary sentence is inapplicable. But the treasury regulation is interpreting the scope of Section 171, not just the exclusionary sentence. The regulation states plainly that a convertible bond is not within the scope of Section 171 if, as here, the option to convert does not rest with the holder. Being without the scope of a deduction Section of the Code means the taxpayer takes no deduction, *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348, not that some strategically selected portion of the Section alone (such as the exclusionary sentence) is inapplicable.

Can also cites our *Roberts & Porter, Inc. v. Commissioner of Internal Revenue*, 307 F.2d 745 (7th Cir. 1962), which states that the Congressional purpose for adding the

3. Indeed, the Internal Revenue Code is written in this fashion. The drafters begin with a general rule which is too vague to give much guidance to tax planners, yet serves as a guidepost for finding the relevant subrules and exceptions, which in turn may be useful only as pointers toward more particular subrules and exceptions, etc. This drafting method is an efficient means of transmitting tax law information for the same reasons that a successful strategy in the game of "twenty questions" is to ask broad questions initially in order gradually to narrow the field of enquiry. See generally J. Pierce, Introduction to Information Theo-ry (2d ed. 1980). Thus here the phrase "convertible bond" might be better interpreted as a signal that the sentence applies only to bonds of the convertible type, rather than as a limitation of the sentence to bonds that have outstanding conversion features at the time the deduction is sought.

4. The bracketed section number follows from the immediately preceding sentence of Treasury Regulations § 1.171–2(c), which states: "The fact that a bond is convertible into stock does not, in itself, prevent the application of section 171."

exclusionary sentence to Section 171's predecessor was "to eliminate amortization of bond premiums, attributable to the conversion feature of convertible bonds, by the holders of such bonds * * *." 307 F.2d at 747. *Roberts & Porter* was correct to state that Section 171 applies to *holders* of convertible bonds (see Section 171(b)(1) (introductory clause)); it does not follow that the exclusionary sentence applies only to holders of unexercised conversion features. In any event, as we discuss below, *Roberts & Porter* involved business expense deductions under Section 162 rather than amortizable bond premium under Section 171.

Can's final argument that the exclusionary sentence is inapplicable is based on the supposed Congressional purpose for enacting it. According to Can, Congress meant to disallow amortization only when the bond premium is paid to acquire a conversion feature, not when it is paid to extinguish one. To support its contention, Can quotes from the House and Senate Reports regarding the exclusionary sentence:

> However, a premium also may arise because the security purchased is convertible into another type of security. Here the premium paid may represent nothing more or less than a portion of the price paid for the security into which the bond is convertible, and the allowance of a deduction for a premium of this type is no more justifiable than it would be for the balance of the investment * * *.

H.R.Rep.No.2319, 81st Cong., 2d Sess. 47–48 (1950); S.Rep.No.2375, 81st Cong., 2d Sess. 47, reprinted in 1950 U.S.Code Cong. & Ad. News 3053, 3100–3101.

The Congressional sentiment expressed above clearly applies to premiums paid to acquire unexercised conversion features, and probably the exclusionary sentence is most often applied to block attempted amortization of bond premium attributable to unexercised conversion features. But it is not so clear that the Congressional sentiment of disallowing a deduction representing a portion of the purchase price paid for stock does not also require disallowance of bond premium due solely to an increase in value of the stock for which the bonds are exchanged.

When the conversion right of convertible bonds has not yet been exercised, bond premium may be attributable to two sources. First, the premium may be due to interest paid on the bonds being higher than the market interest rate for similar risks. In that case, the bond purchaser pays more than the face amount of the bonds in exchange for a higher rate of return. Conceivably, Congress could tax the bond purchaser to the full extent of the higher-than-market return he is receiving, and the bond purchaser would eventually be allowed an offsetting loss when the bonds are sold or retired, measured by the difference between the bond purchaser's basis in the bonds and their face value, *viz.*, the bond premium. Instead, Section 171 allows the taxpayer to amortize this "loss" over the life of the bonds with the result that the stated interest minus the amortization deduction yields a better yearly approximation of the "true" interest income earned by the bondholder.

The second source of bond premium may be the unexercised conversion feature. A bond · purchaser who pays a premium to acquire an unexercised conversion right has in effect bought an option to buy the bond issuer's stock (or, as here, its parent's stock) at a strike price measured in cash or in the face value of debentures to be exchanged. The value of the conversion right is unconnected to the differential between nominal bond interest and market interest, but rather is dependent on fluctuations in the stock market. Since at the earliest there could be no gain or income from a valuable conversion right until conversion or sale of the right, there is no tax-logical reason for amortizing premium attributable to an unexercised conversion feature such as there is to ameliorate periodic, higher-than-market interest income. The "loss" (actually basis) due to the conversion right premium is available to offset the income (or gain) at the time the latter is realized.

Similarly, when a corporation exchanges valuable stock for cheap debentures in fulfillment of a conversion obligation, amortizing the excess does not serve the apparent Congressional purpose of allowing the tax-

payer to pay taxes only on the adjusted, "true" interest income. There is no relationship of the excess to any form of periodic income and thus no obvious reason to permit amortization. Indeed, in this case Can's receipt of interest payments from Overseas is probably a "wash" (*i.e.*, has no net tax consequences) under the consolidated return regulations. Can's interest income on the debentures should be perfectly offset by Overseas' interest deduction. See Treasury Regulations §§ 1.1502–11(a)(1), 1.1502–12, 1.1502–13(b)(1). Thus there would be little point in allowing Can to amortize a premium attributable to any source whatever; the net effect is little different from when a corporation retires its own debentures. See discussion of Section 249 *infra*. Our understanding of Congress' purpose is also bolstered by the well-settled rule that had the bondholders converted Can's debentures rather than Overseas' debentures for Can common stock, Can would have been allowed no loss deduction for the excess of stock value over debenture value. See, *e.g.*, *Chicago, Rock Island & Pacific Ry. v. Commissioner of Internal Revenue*, 47 F.2d 990, 992–993 (7th Cir. 1931); Fleischer & Cary, *The Taxation of Convertible Bonds and Stock*, 74 Harv.L. Rev. 473, 496 (1961). Logic suggests no reason for any distinction based on Can's use of a subsidiary to issue the debentures.

The history of the exclusionary sentence and of the complementary provisions of Section 249 illustrates the line we think Congress meant to draw between bond premium attributable to differential interest rates and premium attributable to the value of the stock into which the bonds may be (or were) converted. The exclusionary sentence was added to the predecessor of Section 171 to undo the effect of *Commissioner v. Korell*, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108. See H.R.Rep.No.2319, *supra*, at 47–48; S.Rep.No.2375, *supra*, at 47. In *Korell* the taxpayer purchased American Telephone and Telegraph Company bonds for a price in excess of the face value of the bonds. The premium was clearly due to the conversion feature of the bonds, still unexercised, that allowed the bondholder to exchange the bonds with cash for common

stock in the American Telephone and Telegraph Company. The taxpayer claimed a deduction for amortizable bond premium under the predecessor to Section 171, and the Commission of Internal Revenue denied the deduction because in the Commissioner's view, the provisions "of the Internal Revenue Code establishing the deduction for 'amortizable bond premium' did not include premium paid for the conversion privilege." 339 U.S. at 620, 70 S.Ct. at 906. The Supreme Court, however, held that the premium was deductible under the ordinary meaning of the statutory language, because up to that time, "Congress [had] made no distinctions based upon the inducements for paying the premium." *Id.* at 628, 70 S.Ct. at 909.

Congress responded by enacting the exclusionary sentence as an amendment to the predecessor of Section 171. Revenue Act of 1950, Pub.L.No.814, § 217, 64 Stat. 941–942; see H.R.Rep.No.2319, *supra*, at 47–48; S.Rep.No.2375, *supra*, at 47 (citing *Korell* and its companion case, *Shoong v. Commissioner*, 339 U.S. 974, 70 S.Ct. 1019, 94 L.Ed. 1380 (per curiam)). The House and Senate Reports stated that the bond premium deduction "was intended primarily to deal with the case where the premium was paid because the security bore a stated rate of interest higher than that prevailing in the current market for securities of a like risk and a similar life. Equity required the allowance of a deduction against ordinary income in cases of this sort." *Id.* The amendment disallowing amortization of any bond premium attributable to a conversion feature thus would limit the deduction to cases where equity requires an adjustment of taxable interest income.

The dichotomy between interest-differential bond premium and conversion-feature premium is also evident from Congress' disallowance of certain bond premium deductions when a corporation repurchases its bonds and the premium is attributable to a conversion feature. In *Roberts & Porter, Inc. v. Commissioner*, 307 F.2d 745 (7th Cir. 1962), we held that a corporation that repurchases for cash at a premium its own still-convertible bonds may deduct the pre-

mium despite the premium being due to the value of the outstanding conversion feature of the bonds. This Court relied upon Section 162(a) of the Internal Revenue Code, which provided a deduction for ordinary and necessary business expenses, and Treasury Regulations § 1.61–12(c)(1), which specifically allowed a deduction when a corporation repurchases its own bonds for "the excess of the purchase price over the issuing price or face value." 307 F.2d at 746. The Court stated: "the plain and ordinary meaning of Regulation 1.61–12(c)(1) dictates that Roberts & Porter be allowed its deduction for the difference between the issuing price and the price paid to purchase and retire the notes * * *. There is no provision in the Code or Regulations which requires allocation of a part of the total purchase price to the value of the conversion privilege." *Id.* at 747. This Court contrasted the apparent loophole in the business expense deduction regulations with the exclusionary sentence of Section 171, by which Congress had clearly "eliminate[d] amortization of bond premiums, attributable to the conversion feature of convertible bonds * * *." *Id.*

Congress subsequently disallowed the business expense deduction for conversion-feature bond premium by enacting Section 249 of the Code, which provides:

(a) General rule.—No deduction shall be allowed to the issuing corporation for any premium paid or incurred upon the repurchase of a bond, debenture, note, or certificate or other evidence of indebtedness which is convertible into the stock of the issuing corporation, or a corporation in control of, or controlled by, the issuing corporation, to the extent the repurchase

price exceeds an amount equal to the adjusted issue price plus a normal call premium on bonds or other evidences of indebtedness which are not convertible. The preceding sentence shall not apply to the extent that the corporation can demonstrate to the satisfaction of the Secretary that such excess is attributable to the cost of borrowing and is not attributable to the conversion feature.

Can does not come strictly within the provisions of Section 249, since it was not the issuing corporation of Overseas' debentures.[5] However, the Section again illustrates the line Congress has consistently drawn between bond premium attributable to the interest cost of borrowing and bond premium attributable to a conversion privilege. As Congress reasoned in passing Section 249, premium due to a conversion feature is "not analogous to an interest expense or deductible business expense, but rather is similar to an amount paid in a capital transaction. In effect, the corporation is repurchasing the right to convert the bonds into its common stock, much as it might purchase its stock." H.R.Rep.No.413, 91st Cong., 1st Sess. 111, reprinted in 1969 U.S.Code Cong. & Ad.News 1645, 1759–1760; see also *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300, 306 n. 19 (2d Cir. 1971). Here Can's transaction did not merely remove from the market the right to enter into a future capital transaction—the evil for which Section 249 disallows any deduction—but involved a present substitution of capital-stock liability for its subsidiary's bonded indebtedness. See Cary, *supra*, 74 Harv.L.Rev. at 497. Thus the Congressional purpose of disallowing deductions for premiums attributable to essen-

---

**5.** Section 249 denies a deduction to the issuer of the repurchased bonds, and in this case Overseas rather than Can is the issuer. There is an argument to be made that Can should be deemed the issuer of the Overseas debentures for purposes of denying Can any deduction for the excess of market value of its shares over the face amount of debentures that were converted after passage of Section 249 in 1969, although we do not decide that issue. Here Can guaranteed Overseas' obligations to pay interest and principal on the bonds and to convert the debentures into Can's stock. Overseas

is a wholly-owned subsidiary of Can created only to arrange overseas financing and to hold foreign operating companies on behalf of Can, and since Can agreed to hold unissued shares of its stock and Overseas never held any, it appears that Can alone intended to satisfy the conversion feature of the debentures. In 1967, the I.R.S. approved Overseas as a separate entity from Can for tax purposes related to its ability to borrow abroad, but its ruling would not allow Can to escape the later mandate of Section 249 to the extent Section 249 applies.

tially capital transactions encompasses the transactions here, and Can's argument that the exclusionary sentence should be construed not to cover the present case is rejected.

### III

■ Can also argues that it should be allowed to deduct the bond premium as an ordinary and necessary business expense under Section 162(a). The district court held that "because of the fortuity of the market place * * * the difference arising on a corporation's exchange of stock having a fair market value greater than the face amount of a bond or debenture received is, if anything, a loss and not an expense." 520 F.Supp. at 579. Since under Section 1032, "[n]o gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock," the district court disallowed the business expense deduction.

■ The district court's decision is correct. Were it not for Section 1032, Can would arguably have realized a taxable gain upon issuance of its stock measured by the difference between the face value of the debentures and its zero basis in the unissued stock. As noted above, the rule is already well established that a corporation realizes no gain or loss when it issues stock in satisfaction of a conversion obligation of its own bonds. There is no reason that use of a subsidiary should make any difference.

However, subsequent to the district court's decision below, the Tax Court decided in two opinions a case that Can argues supports its claimed deduction, *International Telephone & Telegraph Corp. & Affiliated Companies v. Commissioner*, 77 T.C. 60 and 77 T.C. 1367 (1981). In that case, ITT created two subsidiaries, S1 and S2, which acquired substantially all the assets of two target operating companies, T1 and T2, respectively, in Section 368(a)(1)(C) reorganizations using ITT stock. T1 and T2 each had convertible debentures outstanding. In connection with the reorganizations, S1 and S2 assumed liability for the principal of the T1 and T2 debentures, respectively, and ITT agreed to convert the outstanding T1 and T2 debentures into its stock on terms equivalent to those the debenture holders enjoyed prior to the reorganizations. ITT acquired T1 and T2 debentures from their holders in exchange for ITT stock, the fair market value of which was more than one million dollars in excess of the face amount of the debentures. S1 then retired the T1 debentures by paying cash to ITT for the principal amount of the debentures, and ITT contributed the T2 debentures to the capital of S2. The Tax Court held that under the consolidated return regulations then in force (Treasury Regulations § 1.1502–41A(b)), S1 and S2 sustained ordinary, deductible losses measured by the difference between the fair market value of the stock which ITT exchanged for the convertible debentures and the original issue price of the debentures received by T1 and T2 (adjusted for unamortized expenses of issuance). The Tax Court used the fair market value of ITT's stock as the "deemed" or retirement purchase price of the subsidiaries for the debentures because the old consolidated return regulations provided that "if such bonds are acquired from another member of the group during a consolidated return period, * * * the basis thereof to such other member of the group shall be deemed the purchase price" (77 T.C. at 80; court's ellipsis).

Can claims that the *ITT* case shows "there is nothing inherently wrong with a deduction arising from a parent's conversion of a subsidiary's bonds pursuant to a guarantee." Reply Brief at 6. On the contrary, we find no support in *ITT* for Can's attempted deduction. The Tax Court in *ITT* stated that neither party had argued that the exchange by ITT of its stock for the debentures had any tax consequences for the parent, ITT, and the court suggested parenthetically that Section 1032 precluded such tax consequences. 77 T.C. 60, 79. Can has not argued that Overseas is entitled to a deduction for Can's satisfaction of the conversion features on the Overseas debentures, and therefore the Tax Court's allowance in *ITT* of a loss deduction at the subsidiary level is not helpful to Can. Moreover, nowhere in its opinions did the Tax Court construe Sections 162 or 171, but instead it relied upon provisions of the old

consolidated return regulations, in particular Treasury Regulations § 1.1502–41A(b). Can has not argued any corresponding provisions of the new consolidated return regulations that would be applicable here. Therefore, the *ITT* case does not mandate allowing Can any deduction.

We affirm.