SOUTHWESTERN ENERGY COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 772–91.             Filed June 1, 1993.

*Neal R. Pendergraft, E.J. Ball,* and *Kenneth R. Mourton,* for petitioner.

*Jeffry J. Erney,* for respondent.

OPINION

RAUM, *Judge:* The Commissioner determined income tax deficiencies against petitioner for 1985 and 1986 in the amounts of $306,283.10 and $205,922.68, respectively. Petitioner is a group of consolidated corporations consisting of a parent, Southwestern Energy Co. (SW Energy), and subsidiaries which had filed consolidated returns on the accrual basis for those years. Petitioner's principal place of business when the petition herein was filed was in Fayetteville, Arkansas. The dispute before us relates solely to the parent corporation and to one of the subsidiaries, Arkansas Western Gas Co. (AWG). For convenience, the term "petitioner" will be used at times to refer either to SW Energy, AWG, or the entire consolidated group, as indicated by the context. The issues presented for decision relate to: (1) The proper treatment by AWG of certain "overrecoveries" of revenues from the sale of gas in excess of actual gas costs, and (2) the deductibility of SW Energy's claimed liability for interest on convertible debentures allocable to the periods ending on December 31 of each of the taxable years (1985 and 1986) where such interest would never become payable if the debentures were to be converted in the respective following years (1986 and 1987) prior to the March 1 date of record for payment on March 15. The facts have been stipulated.

1. *Gas Sales Overrecoveries*

During the years at issue, AWG was a public utility engaged in the business of selling and distributing natural gas to customers in Arkansas, and was regulated by the Arkansas Public Service Commission (PSC). As a regulated utility, AWG was required to receive approval from the PSC for the tariff rates charged to its customers.

In 1981, AWG received approval from the PSC to use a "cost of gas adjustment" (CGA) clause to compute the tariff-authorized cost of gas to be charged to its customers. The purpose of the CGA was to allow AWG to recoup the entire cost of the gas purchased without having to petition the PSC each time the price of gas changed. However, since there was apparently some lapse of time between the increase or decrease of the price of gas purchased by AWG and the implementation of the new tariff rate computed in accordance with the CGA, the sales of gas by AWG during that interval at the existing tariff rate would result in underrecoveries or overrecoveries by AWG in respect of its cost. Accordingly, the CGA itself was computed by use of a formula that undertook to take into account such underrecoveries or overrecoveries.

The 1981 formula for computing the CGA was superseded by a "tariff agreement" effective January 11, 1985, which was in turn superseded by another "tariff agreement" effective August 7, 1986. A considerably simplified version of the CGA formula as applicable here, but sufficiently accurate for purposes of this case, may be stated as follows: As the cost of gas to AWG rises or falls, the tariff rate is periodically increased or decreased in an amount that reflects the underrecoveries or overrecoveries with respect to gas meanwhile sold by the AWG after the change in the cost of gas to it but prior to the implementation of the new tariff rate.

Neither Arkansas law nor the CGA clause within the tariff agreement required interest to be paid or collected on overrecoveries and underrecoveries, respectively.

AWG reflected the net underrecovery or overrecovery of gas cost on the balance sheet of its financial reports through an asset account entitled "deferred gas purchase cost" (deferred account).[1] Net underrecoveries of gas cost increased the debit balance in the deferred gas purchase asset account, and represented the amount by which actual gas cost *exceeded* the "authorized cost of gas" under the tariff agreement. Net overrecoveries of gas cost decreased the debit balance (and/or increased the credit balance) in the deferred gas purchase asset account, and represented the amount by which the

---

[1] Neither SW Energy nor AWG maintained any written accounting procedures or manuals with regard to the CGA clause. Nor were any such procedures or manuals required under Arkansas statutory law or by PSC rulings.

actual gas cost was *less than* the "authorized cost of gas" based on the tariff rates.

Since the underrecoveries and overrecoveries were handled for financial accounting purposes through the deferred account (an asset account), they did not affect the income statement of AWG's financial reports for the year involved (1986).[2] The cost of gas sold to customers, as reflected in AWG's financial report income statement, was based on the existing tariff rate applicable at the time of sale, without adjustment for differences between the actual cost of gas and the cost of gas based on the tariff rate.[3]

For Federal income tax purposes, however, AWG accounted for underrecoveries differently than it did for overrecoveries. Underrecoveries during a given year served to increase AWG's cost of gas sold, as reflected on petitioner's consolidated tax return. This was accomplished by a Schedule M-1 adjustment reversing the financial accounting entry for the deferred account.[4] Thus, in years when AWG experienced net underrecoveries, the cost of gas sold reported on petitioner's tax return in effect reflected its actual cost—a cost in excess of the cost based on the tariff rate. The result was that, during such underrecovery years, petitioner's taxable income, as shown on its consolidated Federal return, was less than the net income shown on AWG's books by the amount of the Schedule M-1 adjustments.

Conversely, no Schedule M-1 adjustment was made on petitioner's tax return for net overrecoveries. Thus, net overrecoveries did not increase or decrease the cost of gas sold above or below that reported on the financial income statements. In other words, during net overrecovery years, the cost of gas sold by AWG as shown on petitioner's tax return was the same in amount as that shown on the income statement of its financial reports; i.e., in both cases, the cost of gas sold reflected the cost authorized under the *tariff* rate rather than the actual cost to AWG, which during such

---

[2] Since overrecoveries and underrecoveries were part of the formula under the CGA clause, they would indirectly affect *future* period income statements through adjustments to the tariff rate.

[3] See *supra* note 2.

[4] Schedule M-1 of Form 1120 is a schedule attached to the corporate return, Form 1120, and is intended to achieve what its caption suggests: "Reconciliation of Income Per Books With Income Per Return".

overrecovery years was less than the cost based on the tariff rate.

The balance in AWG's deferred gas purchase account for the tax years ending December 31, 1982, through December 31, 1988, was as follows:[5]

| Year end | Debit | Credit | CGA status |
|----------|-------|--------|------------|
| 12/31/82 | $3,176,816 | - - - | Underrecovery |
| 12/31/83 | 1,491,346 | - - - | Underrecovery |
| 12/31/84 | 3,426,296 | - - - | Underrecovery |
| 12/31/85 | 2,814,565 | - - - | Underrecovery |
| 12/31/86 | - - - | ($369,599) | Overrecovery |
| 12/31/87 | - - - | (563,043) | Overrecovery |
| 12/31/88 | 829,278 | - - - | Underrecovery |

For the tax year ended December 31, 1986, AWG had— apparently for the first time[6]—a credit balance in the deferred gas purchase asset account. That credit balance was $369,599, and represented a net overrecovery of gas purchase costs for that year.[7] However, in keeping with its practice, as previously described, petitioner did not make a Schedule M-1 adjustment on its 1986 tax return to reflect the additional amount of reportable gain on the sale of gas attributable to the $369,599 net overrecovery. The upshot of this accounting legerdemain is that $369,599 of gain on the sale of gas was eliminated from petitioner's taxable income and

---

[5] The figures shown on the schedule reflect the cumulative balances as of each of the listed dates of net underrecoveries and net overrecoveries and their concomitant impact on the deferred gas purchases account. The net underrecovery or overrecovery for any given tax year, however, is represented by the decrease or increase, respectively, in the balance for that account. Thus, for the year ending on Dec. 31, 1983, there was obviously a net overrecovery because the balance in the deferred account was reduced below the prior year's balance. However, the deferred account still had a positive (debit) balance as of that date, because the aggregate of underrecoveries exceeded the aggregate of overrecoveries for all years up to and including the year ended Dec. 31, 1983.

[6] The parties' stipulation of facts lists years back only to 1982. Petitioner states on brief, however, that "Prior to ⁕ ⁑ ⁕ 1986, [it] had always been in an undercharge position for its gas cost," and that "During Fiscal Year 1986, ⁕ ⁕ ⁕ [its] situation switched to an overcharge position for the first time". Petitioner's opening brief at 31.

[7] The total amount of net overrecovery for the 1986 taxable year appears to have been $3,184,164, which is the difference between $2,814,565, the "positive" (debit) balance in the deferred gas purchase account as of Dec. 31, 1985, and ($369,599) the "negative" (credit) balance in the deferred account as of Dec. 31, 1986. The difference between these two amounts, $3,184,164, represents the aggregate reduction in the deferred gas purchase account and hence the total amount of net overrecovery during 1986. However, apparently because petitioner properly accounted on its 1986 tax return for that portion of the underrecovery which eliminated the debit balance in the deferred account, i.e., the $2,814,565, the Commissioner's proposed adjustment with respect to the 1986 overrecovery was only $369,599, which was the portion creating a credit balance in the deferred account. Accordingly, it is only the latter amount which is at issue.

thus escaped tax. The Commissioner's determination restored that amount to petitioner's 1986 taxable income. We uphold the Commissioner.

Petitioner's basic contention is that it was obligated under Arkansas law to return the overcharges to its customers, that all events fixing that obligation occurred prior to the close of the taxable year, and that as an accrual basis taxpayer, it was entitled to deduct such overcharges as "ordinary and necessary business expense under Section 162 of the Internal Revenue Code". We find it unnecessary to consider all of petitioner's points, since in our judgment what we are confronted with is not an expenditure (or obligation to make an expenditure) at all.[8] What is before us today is instead merely a requirement under Arkansas law, as reflected in the applicable tariff agreement, that petitioner compute its tariff rate for the following year in such manner as to offset the net overrecoveries for the year in question.

In no way does this case bring into play those provisions of Arkansas law giving customers a right to a refund of overcharges, as argued by petitioner. It is quite true that sec. 23-4-205(b)(2) of the Arkansas Code Annotated (Michie 1987) provides for refunds "When a utility has charged its ratepayers an amount in excess of the utility's approved tariffs". Here, however, by reason of the CGA, the overrecoveries were factored into the adjusted rate for the succeeding period and thus became an authorized part of the tariff rate scheme. They did not represent amounts "in excess of the utility's approved tariffs", and did not furnish the basis for a refund to customers. Nor, as previously noted, was any interest required to be paid upon them.

Plainly, what is involved here is merely a reduction in rates for gas sold by petitioner in 1987 to take into account the 1986 overrecoveries as required by the CGA clause in the tariff agreement. The overrecovery here at issue was not a cost or expense incurred in producing income for 1986. It involved no current outlay of funds nor any obligation to make an outlay in the future.[9] Instead, it merely served as

---

[8] Accordingly, we have no occasion to decide, and we do not decide, whether the overrecovery here at issue would or would not have been deductible under sec. 162 or any other Code provision if it had in fact been an expense.

[9] In *United States v. Block & Kohner Mercantile Co.*, 33 F.2d 196, 198 (E.D. Mo. 1929), affd. 37 F.2d 877 (8th Cir. 1930), the court stated that "It is essential under any system of keeping

a basis for reducing income that would otherwise be received in 1987.

Although the matter is one of first impression in this Court, it was fully considered by the Court of Appeals in *Roanoke Gas Co. v. United States*, 977 F.2d 131 (4th Cir. 1992). In that case, the utility was required by the Virginia State Corporation Commission "to determine the total amount it overcollected from customers for the cost of gas and, in effect, refund the over collections in the next year by an adjustment to the rate it charges its customers." *Id.* at 132. The Court of Appeals considered "whether the obligation to 'refund' overcharges for gas costs through the mechanism of a future rate adjustment is a business expense, as claimed by the taxpayer, or a regulated reduction of income, as argued by IRS." *Id.* at 135. The court concluded that what was before it was not a deductible expense at all, and that

The obligation imposed on Roanoke Gas to adjust future rates thus bears few, if any, characteristics of a liability for past overcharges. No payment is ever made, and no credit is shown on any customer's bill. No effort is made to match "refunds" with persons who overpaid or to assure that those who did not overpay do not receive refunds. The rate adjustment, applying to all sales of gas regardless of whether the customer was overcharged, operates simply to control the amount of income that Roanoke Gas may receive relative to its costs for natural gas measured on the previous year's experience and to assign the income to a given year. [*Roanoke Gas Co. v. United States, supra* at 136.]

We find no significant differences in respect of the issue before us between Arkansas law and Virginia law. The decision in *Roanoke Gas* is squarely in point. Our own views are the same as those expressed in *Roanoke Gas,* and we reach the same result here. We do not find it necessary to discuss various other arguments made by petitioner. Indeed, the result herein is reinforced by the opinion of the Court of Appeals for the Federal Circuit in *Iowa Southern Utils. Co. v. United States*, 841 F.2d 1108, 1113-1114 (Fed. Cir. 1988), which involved a closely comparable issue relating to a utility

books that, before an item can be set up as an expense, it must represent an actual outlay or an actual obligation to make an outlay." Similarly, in *National Can Corp. v. United States,* 520 F. Supp. 567, 579 (N.D. Ill. 1981), affd. 687 F.2d 1107 (7th Cir. 1982), the court remarked that "In its most general acceptance, the term 'expense', when used to determine tax deductions, means money spent: disbursing of money: a drain on one's finances: or the incurring in the tax year of an obligation to pay."

operating under Iowa law. We hold for the Government on this issue.

2. *Interest on Convertible Debentures*

In 1985, SW Energy issued $30 million in 8.5 percent debentures which were convertible at the option of the owner into common stock of the corporation. Interest on these debentures was payable semiannually on March 15 and September 15 to holders of record on March 1 and September 1, respectively. It is undisputed that under the terms of the indenture agreement governing the issuance of the debentures, owners who presented their debentures for conversion prior to the interest record date (March 1 or September 1) were not entitled to any interest for the current 6-month period, whereas those who converted after the applicable record date were entitled to interest for that 6-month period.

On its 1985 and 1986 returns, petitioner deducted $665,833 and $78,060, respectively, as interest accrued on the debentures for the period September 15 through December 31 of each of those years. The Commissioner's deficiency notice disallowing these deductions stated:

> It is determined that the amounts of $665,833.00 and $78,060.00 claimed for interest accruals in 1985 and 1986, on the Southwestern Energy Company 8.5% Senior Convertible Debentures issued in 1985 are not allowable because all the events have not occurred, and therefore, the fact of the liability and the amount of the liability cannot be established. Accordingly, taxable income is increased in the amount of $665,833.00 and $78,060.00 for the taxable years ended December 31, 1985, and December 31, 1986, respectively.

We sustain the Commissioner.

Petitioner is an accrual basis taxpayer. Pursuant to section 461(a) of the Internal Revenue Code, allowable deductions "shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." And section 1.461-1(a)(2), Income Tax Regs., provides that under the accrual method of accounting "an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." This requirement, familiarly known as the "all events test" has been described as follows in the oft-cited

case of *Trinity Constr. Co. v. United States,* 424 F.2d 302, 305 (5th Cir. 1970):

As a general rule the existence of a contingency in the taxable year with respect to a liability or its enforcement prevents accrual. Accrual of a deduction item is permitted only in the taxable year when the obligation to pay it is unconditionally fixed. * * *

Petitioner fails to satisfy the all events test here. It is not entitled to deduct the interest for the period September 15 through December 31 payable on the following March 15 to owners of record on March 1, since its obligation to pay such interest has not become "unconditionally fixed" by December 31. Indeed, its obligation continues to be contingent until the record date of the following March 1. That contingency is that the debentures have not meanwhile been surrendered for conversion to the common stock of petitioner.

The precise issue presented here was considered and decided adversely to petitioner's position in *Scott Paper Co. v. Commissioner,* 74 T.C. 137 (1980). There, under the terms of the indenture agreement, interest was payable on March 1 and September 1, but only to those persons who presented interest coupons on those dates or who were then otherwise registered as debenture holders. In holding that the interest for the period September 1 though December 31 could not be deducted, the Court stated, 74 T.C. at 165:

it was improper to accrue and deduct interest for the period September 1 to December 31 on debentures which remained unconverted on December 31 of a given taxable year, because Scott's liability to pay interest would not be fixed and determinable until March 1 of the following year.

Petitioner makes a feeble attempt to distinguish *Scott Paper* by contending that it, unlike the present case, involved interest coupons. It argues in substance that the requirement that debenture holders present the coupons on the interest date (March 1) in order to receive payment was the condition that prevented accrual prior to March 1 in *Scott Paper,* which is therefore distinguishable. We find this argument to be without merit for at least two reasons. First, as already indicated, the taxpayer in *Scott Paper* issued not only debentures with interest coupons but also registered debentures without interest coupons, and the Court made no distinction whatsoever regarding the two. Second, even if *Scott Paper*

were distinguishable in this respect, the distinction would nonetheless be one without any significant difference. It would merely give effect to shadow over substance. Moreover, the point proves too much. Not only would the logic of petitioner's argument preclude the accrual of interest on *all* coupon debentures, including those that are not convertible, but, at the same time, it would allow taxpayers that had issued debentures without interest coupons to accrue interest expenses without regard to the convertibility of the debentures into stock. We find no relevant ground for distinguishing *Scott Paper.*

Petitioner has attempted to make something out of the fact that during the years in issue "the price of the petitioner's stock ranged from a low of $16¼ per share to a high of $29 per share" and that the conversion price for the debentures was $32⅜ per share, thus making it unlikely that the owners of the debentures would surrender them for conversion. However, the volatility and uncertainty of stock market prices are altogether too well known to assume with comfort as of December 31 that the price of the stock would not reach a level by March 1 to make it advantageous to surrender the bonds for conversion. The matter is speculative and certainly reinforces the contingent nature of petitioner's liability as of December 31. Such contingency prevents petitioner's obligation from being "unconditionally fixed" in the taxable year. *Trinity Constr. Co. v. United States, supra* at 305. We have considered various other arguments made by petitioner and find them unpersuasive. This case is governed by *Scott Paper Co. v. Commissioner,* 74 T.C. 137 (1980). We hold that petitioner's accruals of interest on the convertible debentures for each of the years in issue were properly disallowed by the Commissioner.

*Decision will be entered for respondent.*