HONEYWELL INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15807-83.          Filed September 22, 1986.

*Clinton A. Schroeder, David C. Bahls,* and *Myron L. Frans,* for the petitioner.

*James F. Kidd,* for the respondent.

### OPINION

COHEN, *Judge*: Respondent determined deficiencies of $1,592,852 and $9,542,483 in petitioner's Federal income taxes for 1976 and 1977, respectively. Certain of the adjustments in the statutory notice of deficiency have been resolved by agreement, and all of the facts have been

stipulated. Three issues remain to be resolved on cross motions for partial summary judgment. They are:

(1) Whether sales of leased equipment depreciated under the Class Life Asset Depreciation Range (CLADR) system constitute ordinary retirements under section 1.167(a)-11(d)(3), Income Tax Regs.;

(2) Whether amortizable original issue discount arises on the issuance of debentures by a subsidiary, convertible into stock of its parent, to the extent that the issue price is attributable to the conversion privilege; and

(3) Whether amortizable bond premium arises upon conversion of debentures, equal to the difference between the fair market value of stock distributed in exchange for the debentures and the face value of the debentures.

Honeywell Inc. (petitioner) is a Delaware corporation with its corporate headquarters in Minneapolis, Minnesota. Petitioner and its numerous domestic and foreign subsidiaries engage on a worldwide basis in the design, manufacture, sale, and service of automation equipment and systems, including automation systems and controls for homes and buildings, industrial controls and control systems, aerospace and defense systems, and computer and communication products.

Petitioner and its domestic subsidiaries file consolidated Federal income tax returns using the accrual method of accounting with the calendar year as the taxable year. Petitioner timely filed its Federal income tax returns for 1976 and 1977 with the Internal Revenue Service Center at Ogden, Utah. In addition to disputing the amounts determined by respondent in the statutory notice, petitioner contends that it overpaid its Federal income taxes by $415,509 and $361,591 for 1976 and 1977, respectively.

## Sales of Leased Computers

Since 1957, petitioner has developed and manufactured electronic data processing (EDP) systems. An EDP system, often termed and hereinafter referred to as a computer, is a complex series of equipment consisting of a central processor, input devices, and output devices. Input devices are mechanisms for reading data off punched cards, magnetic tape, and other similar input media, and translating it into

a form usable by a central processor. Output devices are mechanisms such as printers and magnetic tape units which transcribe data from the central processor into a form that can be used or stored outside the central processor.

Since 1970, petitioner's computer business has been conducted principally by its subsidiary, Honeywell Information Systems Inc. (HIS). For purposes of this action there is no need to differentiate between petitioner and HIS, so reference generally will be made simply to petitioner with the understanding that the activities described are in most instances carried on by HIS.

As petitioner's computer business evolved, it came to include both outright sales of new computers to customers, leases of computers to lessees, and sales of leased computers to lessees. Petitioner now manufactures, sells, and leases computers.

The computer business is capital intensive, requires vast expenditures for research and development, and changes rapidly, with equipment quickly becoming technologically obsolete. This means, on the one hand, that manufacturers are particularly concerned with maximizing the number of units delivered to customers and, on the other hand, that customers are frequently reluctant to purchase computers outright. Leasing is a way to accommodate both sets of concerns and, consequently, the leasing of computers has become a significant economic activity.

A willingness to lease computers is a vital part of the business of computer manufacturers such as petitioner. Many potential customers either cannot afford to purchase the equipment or prefer to lease the equipment for financial, tax, or accounting reasons. From the manufacturer's point of view, the ability to lease computers enables it to reach more customers, which permits the generation of additional revenue to offset the massive overhead involved in the development and manufacture of computers. In the computer industry, leasing is so important that a failure to offer leasing as an option would seriously circumscribe a manufacturer's business by substantially reducing the volume of computers that it could ship to customers, thereby reducing its potential revenue and making it more difficult to operate profitably.

The computer business is a significant part of petitioner's business. Petitioner's revenue from its computer business in 1976 and 1977 was approximately 36 percent of its total revenues. More than 30 percent of total inventories as of December 31, 1977, related to its computer business. As of December 31, 1977, more than 70 percent of petitioner's investment in tangible property (land, buildings and improvements, machinery and equipment, and construction in progress), net of accumulated depreciation, was invested in property used in its computer business. During the years in issue, petitioner's investment in equipment leased by it to third parties was in excess of 60 percent of its total investment in tangible property, whether measured by cost or net book value.

Petitioner's revenues from computer rental and service were as follows in 1976 and 1977, which were typical of other years:

|  | 1976 | 1977 |
|---|---|---|
| Computer rental revenue | $304,000,000 | $323,000,000 |
| Computer service revenue | 218,000,000 | 275,000,000 |
| Total | 522,000,000 | 598,000,000 |
| Percentage of information systems (computer business) revenue | 57.1% | 57.7% |
| Percentage of total revenue | 20.9 | 20.5 |

The computer service category includes maintenance service income on computers that have been leased as well as sold.

Petitioner must supply the capital to finance its costs of owning leased computers either through retention of earnings, issuance of stock, or borrowing. Petitioner borrows substantial amounts of capital in order to finance its computer business in general, and its ownership of leased computers, in particular.

All leases of computers by petitioner were subject to written lease contracts. Various forms of contracts were used from time to time, depending upon the length of the lease and other factors, and the forms in use were changed from time to time. Such contracts generally granted the lessee an option to purchase the leased equipment and provided that a portion of the rentals paid would be

credited against the sales price upon the exercise of the option.

Some of the computers initially leased to customers in 1976 ultimately were sold in 1976. The total sales proceeds from the sale of such computers were $4,978,492. Some of the computers initially leased to customers in either 1976 or 1977 ultimately were sold in 1977. The total sales proceeds from the sales of such computers were $26,002,110.

Petitioner's cost of new computers originally placed in service by lease in each of the years 1976 through 1980, and the percentage, by cost, of those leased computers which were sold in each of the years 1976 through 1983 are as shown on page 629.

No lessee was under any obligation to purchase the equipment being leased. If a lessee decided to consider purchasing the equipment, that was a voluntary choice on the lessee's part over which petitioner did not exercise control.

Petitioner was engaged in the trade or business of leasing computers and of selling computers within the meaning of the Internal Revenue Code at all times relevant to this action. For all times material and up to the time that the equipment was sold, respondent has allowed petitioner to treat the computers manufactured by it and leased to its customers as section 1245[1] property for which a depreciation deduction was allowable and as section 1231 property by reason of being used in petitioner's trade or business as soon as they were held for the time required by section 1231(b)(1).

Petitioner elected to depreciate all of its computers that it placed in service by leasing to customers in 1976 and 1977 under the CLADR system pursuant to section 167(m) and section 1.167(a)-11, Income Tax Regs., which provides in pertinent part as follows:

(a) *In general*—(1) *Summary.* This section provides an asset depreciation range and class life system for determining the reasonable allowance for depreciation of designated classes of assets placed in service after December 31, 1970. The system is designed to minimize disputes between taxpayers and the Internal Revenue Service as to the useful life of

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue.

| Year placed in service | 1976 | 1977 | 1978 | 1979 | 1980 |
|---|---|---|---|---|---|
| Cost of computers placed on lease during the year | $127,784,092 | $110,978,436 | $120,875,786 | $131,715,222 | $129,113,569 |
| Percentage of cost of computers placed on lease during the year, subsequently sold in— | | | | | |
| 1976 | 1.9% | - - - | - - - | - - - | - - - |
| 1977 | 3.4 | 5.7% | - - - | - - - | - - - |
| 1978 | 3.8 | 4.9 | 1.2% | - - - | - - - |
| 1979 | 4.3 | 4.8 | 12.2 | 3.4% | - - - |
| 1980 | 3.3 | 4.6 | 4.4 | 5.7 | 1.9% |
| 1981 | 4.4 | 4.9 | 5.8 | 6.4 | 5.9 |
| 1982 | 2.6 | 4.0 | 4.0 | 5.4 | 5.1 |
| 1983 | 2.9 | 4.0 | 4.4 | 4.2 | 5.0 |
| Total percentage by cost of computers initially leased and subsequently sold | 26.6 | 32.9 | 32.0 | 25.1 | 17.9 |

property, and as to salvage value, repairs, and other matters. The system is optional with the taxpayer. The taxpayer has an annual election. * * * Generally, the taxpayer must establish vintage accounts for all eligible property included in the election, must determine the allowance for depreciation of such property in the taxable year of election, and in subsequent taxable years, on the basis of the asset depreciation period specified in the election, and must apply the first-year convention specified in the election to determine the allowance for depreciation of such property. This section also contains special provisions for the treatment of salvage value, retirements, and the costs of the repair, maintenance, rehabilitation or improvement of property. In general, a taxpayer may not apply any provision of this section unless he makes an election and thereby consents to, and agrees to apply, all the provisions of this section. A taxpayer who elects to apply this section does, however, have certain options as to the application of specified provisions of this section. A taxpayer may elect to apply this section for a taxable year only if for such taxable year he complies with the reporting requirements of paragraph (f)(4) of this section.

(2) *Definitions.* For the meaning of certain terms used in this section, see paragraphs * * * (d)(3)(ii) ("ordinary retirement" and "extraordinary retirement") * * *

(b) *Reasonable allowance using asset depreciation ranges—* * * *

    *    *    *    *    *    *    *

(3) *Requirement of vintage accounts—*(i) *In general.* For purposes of this section, a "vintage account" is a closed-end depreciation account containing eligible property to which the taxpayer elects to apply this section, first placed in service by the taxpayer during the taxable year of election. The "vintage" of an account refers to the taxable year during which the eligible property in the account is first placed in service by the taxpayer. * * *

    *    *    *    *    *    *    *

(d) *Special rules for salvage, repairs and retirements—* * * *

    *    *    *    *    *    *    *

(3) *Treatment of retirements—*(i) *In general.* The rules of this subparagraph specify the treatment of all retirements from vintage accounts. * * * An asset in a vintage account is retired when such asset is permanently withdrawn from use in a trade or business or in the production of income by the taxpayer. A retirement may occur as a result of a sale or exchange, by other act of the taxpayer amounting to a permanent disposition of an asset, or by physical abandonment of an asset. A retirement may also occur by transfer of an asset to supplies or scrap.

(ii) *Definitions of ordinary and extraordinary retirements.* The term "ordinary retirement" means any retirement of section 1245 property from a vintage account which is not treated as an "extraordinary retirement" under this subparagraph. * * *

(iii) *Treatment of ordinary retirements.* No loss shall be recognized upon an ordinary retirement. Gain shall be recognized only to the extent specified in this subparagraph. All proceeds from ordinary retirements shall be added to the depreciation reserve of the vintage account from which the retirement occurs. See subdivision (vi) of this subparagraph for optional allocation of basis in the case of a special basis vintage account. See subdivision (ix) of this subparagraph for recognition of gain when the depreciation reserve exceeds the unadjusted basis of the vintage account. * * *

\* \* \* \* \* \* \*

(ix) *Recognition of gain or loss in certain situations.* (a) In the case of a vintage account for section 1245 property, if at the end of any taxable year after adjustment for depreciation allowable for such taxable year and all other adjustments prescribed by this section, the depreciation reserve established for such account exceeds the unadjusted basis of the account, the entire amount of such excess shall be recognized as gain in such taxable year. * * *

The parties agree that the subject sales are not extraordinary retirements.

Petitioner established vintage accounts for the computers leased during 1976 and 1977, respectively; established a depreciation reserve for each vintage account; and properly depreciated the computers in accordance with its CLADR election in 1976 and 1977 prior to their sale.

In accordance with its view of section 1.167(a)-11, Income Tax Regs., petitioner did not recognize gain on the sale of the computers initially leased during 1976 and subsequently sold during 1976 or 1977 or on the sale of the computers initially leased during 1977 and subsequently sold in 1977. The proceeds from the sales of such computers were added to the depreciation reserve of the appropriate vintage account. Because the depreciation reserve of the vintage account, after the addition of such sales proceeds, was less than the cost basis of the vintage account, petitioner recognized no gain in the year of the sale.

Petitioner continued after 1977 to add the proceeds from the sale of leased computers to the depreciation reserve for the vintage account in which the cost of the computers sold had been recorded. Once the depreciation reserve for a vintage account equaled the cost basis thereof, petitioner reported the entire sales proceeds as ordinary income.

The history of petitioner's reporting for the 1976 and 1977 vintage accounts and the sale of leased computers, the

cost of which had been recorded in those accounts, was as follows:

|  | | *1976* | *1977* |
|---|---|---|---|
| Initial cost basis | | $153,250,489 | $154,190,709 |
| Additions to depreciation reserve: | | | |
| 1976: | Depreciation | 19,759,916 | - - - |
| | Sales of leased computers | 7,815,338 | - - - |
| 1977: | Depreciation | 35,556,975 | 19,215,607 |
| | Sales of leased computers | 13,030,248 | 23,082,890 |
| 1978: | Depreciation | 30,938,502 | 36,110,302 |
| | Sales of leased computers | 10,830,263 | 20,109,302 |
| 1979: | Depreciation | 24,519,632 | 30,221,378 |
| | Sales of leased computers | 12,120,412 | 12,552,129 |
| 1980: | Depreciation | - - - | 15,727,953 |
| | Sales of leased computers | - - - | 0 |
| 1981: | Depreciation | (1,320,797) | (2,828,852) |
| | Sales of leased computers | - - - | 0 |
| Total: | Depreciation | 109,454,228 | 98,446,388 |
| | Sales of leased computers | 43,796,261 | 55,744,321 |
| | Total | 153,250,489 | 154,190,709 |
| Proceeds of sales of leased computers taken directly into income: | | | |
| 1979 | | 806,854 | - - - |
| 1980 | | 6,242,226 | . 7,119,515 |
| 1981 | | 1,881,645 | 6,455,575 |
| 1982 | | 2,466,743 | 4,699,248 |
| 1983 | | 5,266,865 | 6,465,110 |
| Total through 1983 | | 16,664,333 | 24,739,448 |

The credit to depreciation in 1981 was an internal audit adjustment to correct earlier errors.

Respondent's position is that sales of computers that are leased to customers of petitioner are not "retirements" and that they are not governed by the CLADR regulations. Respondent determined that petitioner's income should be adjusted by adding to sales revenues the selling price of the computers; adding to cost of sales the original cost basis of the computers less depreciation taken; reducing depreciation expense by removing the unadjusted basis of the property sold from the vintage account; and reducing the reserve for depreciation by removing the accrued depreciation for the property sold from the reserve account. The dispute between the parties is over the propriety of the adjustments; the amounts of the adjustments are not in dispute.

Petitioner contends that it followed precisely respondent's regulation set forth above and that, therefore, it is entitled to have its method of treating sales of computers approved. Respondent acknowledges that the regulations have been followed by petitioner but contends that the regulations were not intended to cover the computers sold by petitioner because such computers are "dual purpose property," i.e., property held both for sale and for lease. Thus, argues respondent, sales of the computers by petitioner are not "retirements" under the regulations, and gain on such sales must be computed and reported as they occur.

The concept of "dual purpose property" has been recognized in a series of cases relied on by respondent. *Hollywood Baseball International Shoe Machine Corp. v. United States*, 491 F.2d 157 (1st Cir. 1974); *Association v. Commissioner*, 423 F.2d 494 (9th Cir. 1970); *Continental Can Co. v. United States*, 190 Ct. Cl. 811, 422 F.2d 405; *Recordak Corp. v. United States*, 163 Ct. Cl. 294, 325 F.2d 460. These cases stand for the proposition that a manufacturer regularly engaged in the dual business of selling and renting the equipment it manufactures can claim depreciation on property that is at all times available for sale. Proceeds from the sale, however, are treated as ordinary income even though the property might otherwise qualify for capital gain treatment under section 1231. Respondent argues:

The logical result of this is that sales of dual purpose property are not sales of depreciable property at the time of sale even if the property was under lease just before the sale. Capital gains treatment is unavailable because at the time of the sale the equipment is deemed to have been held primarily for sale to customers in the ordinary course of business. This is the distinguishing factor between the type of retirements involved in petitioner's case and any other sale or exchange of an asset that is not dual purpose property, which would fairly be treated as an "ordinary retirement" under the regulations.

It is respondent's position that those sales that should be treated as ordinary retirements are sales of assets that would not be treated as being held primarily for sale to customers when they are sold. * * *

Because "dual purpose property" may be treated as being held for sale at the time of sale, argues respondent, the property is not as of that moment in time held for the production of income or eligible for depreciation. Respondent concludes "accordingly, removal of petitioner's com-

puters from their vintage account can be construed to have been necessitated not by a 'retirement,' but by the failure of the asset to qualify generally as depreciable property under the statute."

In support of his interpretation of the regulations, respondent describes the substantial deferral of recognition of income from sales of property to customers in the ordinary course of business and the basic purpose of the statute and regulations establishing the CLADR system to provide simplicity and ease of application. He argues that section 167(m) was not intended to reverse prior case law defining dual purpose property.

Petitioner relies on its adherence to the literal terms of the regulations and the absence of anything in the regulations supporting respondent's position. According to petitioner, the cases relied on by respondent deal only with the character of the gain recognized and not with the timing of the gain; because the gain ultimately recognized on sale of petitioner's computers will undisputably be ordinary gain, these cases do not provide the authority that respondent seeks. Respondent counters that the cases in question establish a "concept" that we should recognize as inherently keeping petitioner's computers outside of the scope of the regulations.

Answering respondent's arguments about the purposes of the statute and regulations establishing the CLADR system, petitioner argues that its application of the system is consistent with the history and policy of the statute and regulations. Simplicity is served, and because a taxpayer is required to defer recognition of loss as well as gain, the system is not inherently unfair. To the extent that the system is intended to encourage capital investment in depreciable property by providing favorable tax treatment for the property, there is no reason to deny that treatment to petitioner's property. Finally, petitioner asserts "a taxpayer's right to rely on clear and unambiguous regulations." Petitioner argues:

The IRS drafted the detailed regulations and did not choose to provide for any special treatment for such leased property. The IRS did not publicly state that its position was that a portion of the CLADR regulation would not apply to this leased property until the issuance of

Revenue Ruling 80-37, 1980-1, C.B. 57 [sic], in 1980. Of course, as is discussed below, a revenue ruling cannot overrule a regulation, so the revenue ruling has no effect, but taxpayers were not even put on public notice until 1980 of the possibility the IRS would not follow its own regulations. Even if the revenue ruling did have effect for years after it was issued, it would be an abuse of discretion to apply it retroactively to the years in question since it is a change of position.

Petitioner cites a series of Internal Revenue Service memorandum documents issued in 1979 as indicating that the question of dual purpose property was not considered by the drafters of the regulations, and consideration was given to amending the regulations to expressly cover the situation of dual purpose property. Technical Advice Memorandum 7950005 (Aug. 13, 1979); G.C.M. 38116 (Sept. 28, 1979); see *Rowan Companies, Inc. v. United States*, 452 U.S. 247, 261 n. 17 (1981). Rather than amending the regulations, however, the Internal Revenue Service issued Rev. Rul. 80-37, 1980-1 C.B. 51, containing the arguments now relied on by respondent.

On this issue we conclude that petitioner is entitled to summary judgment in its favor. Respondent's reliance on cases defining dual purpose property as establishing a "concept" to override the express language of his regulations is unpersuasive. Section 1.167(a)-11(d)(3), Income Tax Regs., on its face is comprehensive as to "all retirements from vintage accounts," i.e., permanent withdrawal of the asset "from use in a trade or business or in the production of income by the taxpayer," and "may occur as a result of a sale or exchange, by other act of the taxpayer amounting to a permanent disposition of an asset, or by physical abandonment." Petitioner has not challenged, nor do we, respondent's right to amend the regulations to make the distinction between property held solely for use in its leasing business and property held either for lease or for sale. He cannot, however, achieve this result by a revenue ruling or by judicial intervention. See *Woods Investment Co. v. Commissioner*, 85 T.C. 274, 281-282 (1985).

### Convertible Debenture Issues

On January 31, 1968, Honeywell Overseas Finance Co. (HOFC) was incorporated under the laws of the State of

Delaware as a 100-percent owned subsidiary of petitioner, with capital of $6 million. HOFC has functioned at all times since its incorporation as a separate corporate subsidiary of petitioner. It was included in the consolidated Federal income tax returns filed by petitioner and its subsidiaries for years beginning in 1968, including 1976 and 1977.

HOFC is what is commonly referred to as an international finance subsidiary. It was formed for the principal purpose of obtaining funds (eurodollars) from overseas sources to be lent to or invested in foreign subsidiaries of petitioner. Petitioner formed the subsidiary in order to avoid subjecting the foreign lenders to (i) U.S. income tax of 30 percent of the interest paid, which tax would have been collected by withholding from the interest otherwise payable to the lenders, and (ii) U.S. estate tax. To avoid withholding and estate taxes, the borrowing corporation must receive less than 20 percent of its income from U.S. sources. (See generally *National Can Corp. v. United States*, 687 F.2d 1107, 1108-1109 (7th Cir. 1982).)

On February 15, 1968, HOFC offered and sold at par $30 million of 15-year, 5-percent debentures. The debentures were exchangeable for petitioner's common stock at $103.25 per share (with cash payable in lieu of fractional shares) from August 15, 1968, through February 15, 1983.

Petitioner engaged Eastman Dillon, Union Securities & Co., to render an opinion with respect to the amount of "discount" attributable to the "conversion" feature of the debentures. In a letter dated July 15, 1969, resulting from that engagement, Eastman Dillon, Union Securities & Co., by a general partner, stated:

We do not regard the amount of each "discount" as precisely determinable and are unable to make such determination. However, if Honeywell Overseas had in February 1968 sold a non-convertible debenture issue, guaranteed by Honeywell, Inc., we estimate that the issue could have been sold at a 7.35% yield. Using such a yield for computing the discount on the Convertible Debentures, they would have had to be sold at a price of 78.86% to produce a similar yield to maturity. Assuming the maximum value allocated to the conversion feature is the difference between that price and the price at which the Convertible Debentures were sold, the "discount" would be $6,342,000.

Petitioner claims that it is entitled to amortize the sum of $6,342,000 over the 15-year life of the debentures, i.e., deductions of $422,796 per year.

The indenture provided that the debenture holders seeking to exchange their debentures for petitioner's stock would notify and deliver their debentures to the trustee, which would deliver the petitioner's stock in exchange. The stock was to be provided by HOFC unless otherwise agreed by HOFC and petitioner. The indenture also provided that petitioner was required to have stock available to make the exchanges.

Prior to any exchanges, HOFC and petitioner arranged for the exchanges to be made by petitioner using newly issued stock of petitioner. All exchanges were accomplished by a debenture holder exchanging his debenture with petitioner for petitioner's stock and perhaps cash in lieu of fractional shares. HOFC had the use of the capital raised by the debentures from their issuance on February 15, 1968, until their retirement on February 15, 1983. HOFC continued to pay interest on exchanged debentures following the exchanges through February 15, 1983. On February 15, 1983, all debentures not previously exchanged were retired by payment of the face amounts thereof by HOFC to the holders thereof.

Following each exchange, the debentures exchanged were held by petitioner until the February 15, 1983, maturity date of the debentures. On February 15, 1983, the debentures previously exchanged were delivered by petitioner to HOFC in exchange for the payment by HOFC to petitioner of the face amounts thereof.

(1) *Original issue discount.*

Section 1.163-3(a)(1), Income Tax Regs., provides:

(a) *Discount upon issuance.* (1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity * * * over the issue price of the bond (as defined in paragraph (b)(2) of sec. 1.1232-3).

Section 1.1232-3(b)(2)(i), Income Tax Regs., provides in part:

In the case of an obligation which is convertible into stock or another obligation, the issue price includes any amount paid in respect of the conversion privilege. * * *

These regulations reflect the longstanding principle that when a note, bond, or other form of payment obligation is issued in an amount exceeding the proceeds actually received by the borrower, the difference between the two, referred to as the "discount," is deductible as interest. *Helvering v. Union Pacific Railroad Co.*, 293 U.S. 282 (1934).

The above regulations were promulgated on December 23, 1968, to apply to obligations issued after December 31, 1954. T.D. 6984, 1969-1 C.B. 38, 40. Petitioner contends that the regulations cannot be retroactively applied to the HOFC debentures issued February 15, 1968. Rather than dealing directly with the retroactivity question, respondent relies on various cases that, independent of the regulations, have held that a conversion privilege in a debenture does not give rise to an amortizable discount. *Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971); *AMF Incorporated v. United States*, 201 Ct. Cl. 338, 476 F.2d 1351; *Hunt Foods & Industries, Inc. v. Commissioner*, 57 T.C. 633 (1972), affd. per curiam 496 F.2d 532 (9th Cir. 1974). Petitioner contends that the cited cases are distinguishable because each one involved a situation in which the debentures were convertible into the stock of the issuer, whereas here the debentures were convertible into the stock of the parent of the issuer.

Petitioner argues that there has been a discount from the purchase price received by the issuer, attributable to the conversion feature, whether the debentures consist of two separate property rights or constitute a single property. In its argument, petitioner refers to the conversion feature as an "exchange privilege," that it purports to distinguish from the usual conversion feature where the issuer of the debenture and the issuer of the stock are the same corporation. In support of this distinction, petitioner argues:

When a corporation issues debentures that may be converted to the issuing corporation's stock, the debentures may be either exchanged for stock or retained until redeemed or retired. In other words, the debenture has two potential uses; one in the case of the exchange for stock in which

the debenture holder converts his debt instrument into an equity instrument; and the second, when the debenture holder retains the debt instrument until it is redeemed or retired. This dual-purpose feature of a debenture with a conversion feature for the issuing corporation's own stock is not present in the petitioner's case. HOFC has issued its debentures which may be converted into the stock of its parent, Honeywell. Therefore, even though the original HOFC debenture holder may exchange the debenture for stock of the parent (Honeywell), the parent holds the debenture as a debt instrument until it is redeemed or retired. Thus, at no time does the conversion feature relate to any equity position in the issuing corporation, HOFC. In this situation, the debenture issued by HOFC at a discount represents a cost or expense in acquiring the use of capital to the issuance of the debentures.

We are unpersuaded by petitioner's attempted distinction. Although the debt may remain outstanding even after conversion by the debt holder, the position of the issuer, HOFC, remains the same. HOFC has received the full amount of the proceeds. That the parent may have to comply with the conversion privilege, and that the full amount of the debentures will be due from the issuer, does not reduce the consideration actually received by the issuer. Petitioner argues that the conversion privilege was not sold by the issuer of the debentures "for its own account," but there is no indication that the parent received a part of the proceeds, rather than the issuer.

The rationale in *Chock Full O'Nuts Corp. v. United States, supra,* and the cases following it applies a fortiori where, as here, the *issuer* pays no more upon redemption of a debenture than was received on the issuance of the debenture. HOFC does not face any economic loss at the time of conversion, as contrasted to the issuer who may be required to redeem or to convert at the option of the debenture holder. See *Chock Full O'Nuts v. United States,* 453 F.2d at 304. Moreover, the amount deemed to be paid for the conversion feature is not in the nature of interest, i.e., the cost of obtaining capital. See *Chock Full O'Nuts v. United States,* 453 F.2d at 305-306. Thus, the rationale of these cases was extended to the issuance of debentures by a subsidiary convertible into stock of its parent in *National Can Corp. v. United States,* 520 F. Supp. 567, 574-576 (N. D. Ill. 1981), affd. on other issues 687 F.2d 1107 (7th Cir. 1982). Although it may be true, as petitioner argues, that where the same corporation is the issuer of the debentures

and of the stock, the total consideration to be paid on conversion is uncertain as of the time of the issuance, the distinction does not undermine the rationale of the controlling authorities.

We therefore conclude that respondent is entitled to prevail as a matter of law on this issue, and that petitioner has no amortizable original issue discount arising from issuance of the HOFC debentures.

## (2) *Bond premium.*

Petitioner seeks to deduct as bond premium expense under section 171 the difference between the market value of petitioner's stock at the time of a conversion and the face value of the debentures converted. Again, the theory of deductibility is that the amount, i.e., the premium, is a cost of using the capital. Section 171(b)(1), however, provides that the amount of amortizable bond premium on a convertible bond shall not include any amount attributable to the conversion features of the bond.

The parties agree that this issue was decided adverse to the taxpayer in *National Can Corp. v. United States*, 687 F.2d 1107 (7th Cir. 1982). Petitioner argues, however, that *National Can Corp.* was wrongly decided in view of *Commissioner v. Korell*, 339 U.S. 619 (1950).

In *Korell*, the Supreme Court concluded that amortizable bond premium arose under an earlier statutory provision from payment for convertible bonds in excess of the face value of the bonds as a result of a conversion feature in the bonds. The Supreme Court stated:

We adopt the view that "bond premium" in section 125 means any extra payment, regardless of the reason therefor, in accordance with the firmly established principle of tax law that the ordinary meaning of terms is persuasive of their statutory meaning.

We conclude that Congress made no distinctions based upon the inducements for paying the premium. Congress delimited the bond premium it wished to make amortizable in terms of categories of bonds, and there is no doubt that respondent purchased bonds which are included within the purview of section 125. * * * [*Commissioner v. Korell*, 339 U.S. at 627-628. Fn. ref. omitted.]

Following *Korell*, Congress amended the statutory provision to exclude from amortization of bond premium the

amount of a premium paid by the purchaser "attributable to the conversion feature of the bond." This rule was continued as section 171(b)(1) of the Internal Revenue Code of 1954. In *Hanover Bank v. Commissioner*, 369 U.S. 672, 683 (1962), the Supreme Court commented:

> The decision in *Korell* led to congressional re-examination of Section 125, and the enactment of Section 217(a) of the Revenue Act of 1950 (64 Stat. 906), which eliminated amortization of bond premiums attributable to a conversion feature. However, response to the *Korell* decision was specifically limited to the convertible bond situation; no further change was made in the statute which would reflect on its interpretation in the case before us.[17]

17. The legislation simply provided:

"In no case shall the amount of bond premium of a convertible bond include any amount attributable to the conversion features of the bond."

Where, as in the case before us, a question of interpretation of Section 125 is presented lying outside the scope of the 1950 Amendment, *Korell* retains its full vitality. * * *

[369 U.S. at 683.]

Petitioner argues that, as a result of the Supreme Court opinions, the term "bond premium" in the applicable statutes is defined as "any extra payment, regardless of the reason therefor." Petitioner would define the exception in section 171(b) as inapplicable here because the debentures are not convertible in the hands of Honeywell, so that Honeywell paid nothing "attributable to" the conversion feature. Petitioner argues that the Court of Appeals for the Seventh Circuit erred in interpreting the phrase "attributable to" to convertible bonds before or after conversion, whereas the intention of the drafters of the legislation responding to *Korell* was merely to differentiate between premium attributable to interest rate considerations and premium attributable to a conversion feature.

Respondent's primary argument is that the amount in question cannot be amortizable bond premium because it did not arise on issuance of the bond, and the payment by the parent must be treated as a contribution of capital from petitioner to HOFC. In resolving the contentions of the parties, it is thus helpful to determine the true nature of the payment. Respondent argues that the amount in question, i.e., the excess of the fair market value of the stock over the

par value of the converted debenture, was created and "paid," not because of a variation in the interest rate market, but solely on account of the conversion feature as a function of the stock market. In *National Can Corp v. United States, supra,* the Court of Appeals reasoned that congressional purpose in enacting section 171(b)(1) was to preclude an interest deduction for a stock conversion. 687 F.2d at 1114-1115.

On careful analysis, we believe that respondent's theory more accurately describes the feature to which the payment in question is attributable. At the time of issuance of the debentures, the interest rate market would have affected the determination of the conversion price. After that date, the decision of the holder of a debenture to continue to hold it or to convert it to stock would be affected by both changes in the interest rate and changes in the stock value. But once the stock was worth a sufficient amount in excess of the conversion price, the holders were likely to redeem the debentures. Stock could thereafter be held or converted into interest-bearing assets at the then current market rate. Although the converted debentures were no longer convertible in the hands of the parent, the amount paid by the parent to the redeeming holder was in satisfaction of the holder's conversion privilege and logically is attributable to that privilege and not to additional interest necessary to secure the proceeds of the original issue.

Thus we cannot disagree with the reasoning or the holding of the Court of Appeals in *National Can Corp. v. United States, supra.* Whether the amount in question is described as bond premium but limited by the exception contained in section 171(b) or is not bond premium in the first instance, respondent is entitled to summary judgment as a matter of law on this issue.

*An appropriate order will be entered.*