IDAHO FIRST NATIONAL BANK AND ITS SUBSIDIARY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MOORE FINANCIAL GROUP, INC. AND ITS SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 27381-88, 27382-88.    Filed August 23, 1990.

*Robert J. Jones, L. Hope O'Keeffe,* and *Steven P. Lockman,* for the petitioners.
*Wilton A. Baker,* for the respondent.

COHEN, *Judge:* In these consolidated cases, respondent determined deficiencies in and additions to tax as follows:

| Case | Year | Deficiency | Addition to tax Sec. 6661 |
|---|---|---|---|
| Idaho First National | 1980 | $976,837 | - - - |
| Docket No. 27381-88 | | | |
| Moore Financial Group | 1981 | 181,469 | - - - |
| Docket No. 27382-88 | 1983 | 22,105 | $5,526 |
| | 1984 | 2,528,808 | 632,202 |
| | 1985 | 907,991 | 226,998 |

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue.

After concessions, the primary remaining issue, which is discussed and decided in this opinion, is whether certain losses incurred in disposing of assets acquired from an insolvent bank are built-in deductions or are losses incurred in rehabilitating the acquired bank within the meaning of section 1.1502-15(a)(2), Income Tax Regs. If such losses are built-in deductions, we must decide whether they qualify for the de minimis exception in section 1.1502-15(a)(4)(i)(b), Income Tax Regs.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Moore Financial Group, Inc. (Moore), a regional bank holding company with its principal offices in Boise, Idaho, was formed in 1981. Moore filed consolidated Federal income tax returns with its includable subsidiaries during the years in issue.

In 1982 and 1983, as part of a long-term strategic business plan for expanding throughout the Pacific Northwest, Moore decided to expand into Oregon by acquiring a financial institution in that State. Regulatory constraints precluded Moore's entry into Oregon other than by acquisition of an insolvent financial institution.

In 1983, Oregon Mutual Savings Bank (OMSB) was the tenth largest bank in Oregon, with 13 branch locations in Portland and adjacent suburbs. Because the rates of return on its earning assets, primarily real estate mortgage loans, were less than its cost of funds, OMSB suffered substantial operating losses prior to 1983.

In early 1983, the banking division of the Oregon State Department of Commerce (banking division) attempted unsuccessfully to find an Oregon financial institution that was willing to acquire OMSB without the assistance of the Federal Deposit Insurance Corporation (FDIC). Subsequently, the banking division and the FDIC worked together to structure an "assisted acquisition" of OMSB.

As a matter of policy, the FDIC prefers an assisted acquisition over a liquidation, because it is less disruptive to the community, depositors, employees, and borrowers, and because it promotes confidence in the banking system and preserves existing deposit relationships and banking facilities. There are limits, however, to the amount of assistance the FDIC will provide. Generally, the FDIC will not provide financial assistance that exceeds the cost of liquidation. The FDIC insures depositors, not banks, and an FDIC assistance payment is not an insurance payment. The FDIC assistance payment is not a payment for services by the acquiring institution and does not relate to any specific services. The FDIC maintains an arm's-length relationship with bidders in an attempt to develop a competitive environment and thereby obtain the best financial results.

In July 1983, the FDIC solicited bids for the acquisition of OMSB. The bidding process was open to any interested party. The FDIC bid guidelines stated:

The * * * [FDIC] has been informed by the Superintendent of Banks of the State of Oregon that the OREGON MUTUAL SAVINGS BANK * * * is in danger of failure. As an alternative to a statutory payout to insured depositors, offers are being solicited to purchase Oregon Mutual. To accomplish this, the FDIC will accept proposals as described in the accompanying BID GUIDELINES.

> \*  \*  \*  \*  \*  \*  \*

8. (a) In addition to any requirements established by other regulators, the FDIC will require that certain minimum capital requirements be met by the resultant bank and its holding company. A bid transaction involving the chartering of a new bank will be required to meet the capital standards of the chartering authority (State, OCC or FHLBB); in no instance, however, will the bid be accepted if it provides for less than the FDIC's minimum five percent tangible equity capital. The FDIC will not accept any bid(s) from a bank or a holding company where the resulting bank and/or its consolidated holding company will have a ratio of tangible equity capital to total assets of less than five percent. * * *

On July 28, 1983, Moore submitted a bid to the FDIC to acquire OMSB in an assisted transaction. Moore's bid was conditioned upon the FDIC's contribution of $11.85 million to OMSB's capital. In formulating the bid, Moore considered its assessment of the value of OMSB's assets as well as its

future profitability. Coopers & Lybrand, a national accounting firm, assisted Moore in its preacquisition analysis to determine how much to bid for OMSB. The components of Moore's bid included the capital it would be required to inject, the debt it would assume, and the assistance the FDIC would contribute.

The bid submitted by Moore stated:

We plan to contribute $12 million in equity capital to the new bank. In addition through purchase accounting, a reserve for loan losses of $1.5 million will be established at the date of acquisition. Thus, primary capital will total $13.5 million and will provide the required 5% tangible equity capital assuming total assets are less than $270 million at the date of acquisition. In addition Moore * * * will provide the new bank with $5 million in subordinated notes due 1993 with interest at 11.3% and no principal payments until maturity. Therefore, total capital will equal $18.5 million and the total capital to asset ratio will be greater than the regulatory requirements of 6.5%. Moore * * * has the financial capacity to provide additional equity capital or subordinated debt to provide for future growth as the need might arise. * * *

Moore's bid was accepted by the FDIC on July 29, 1983, and approved by the banking division on August 5, 1983.

On August 5, 1983, Moore and the FDIC entered into an assistance agreement in which the FDIC agreed to contribute $11.85 million to OMSB contingent upon OMSB's conversion to a State stock commercial bank and the acquisition of all the stock of the converted entity by Moore. Under the terms of the assistance agreement, OMSB was required to have tangible capital equal to at least 5 percent of its assets immediately subsequent to the acquisition.

On August 5, 1983, the FDIC contributed $11.85 million to OMSB. The FDIC's contribution was recorded as paid-in capital on OMSB's books. Following the contribution of the FDIC assistance, OMSB was converted from a mutual savings bank into a State-chartered stock bank and renamed Oregon First Bank (OFB). Immediately following OFB's conversion, Moore transferred $18 million to OFB. Of that amount, $12 million was a capital contribution and $6 million was for an 11.3-percent subordinated note due May 1, 1993. OFB thereupon became a member of the Moore consolidated return group for Federal income tax purposes.

OMSB filed a short-period income tax return for the period January 1, 1983, through July 31, 1983. The short-period

return used the ending date of July 31, 1983, as a matter of convenience in order to avoid the costs of a mid-month closing of OMSB's books. Moore's consolidated Federal income tax return for 1983 included OMSB's income for the period August 1, 1983, through August 5, 1983, and OFB's income for the period August 5, 1983, through December 31, 1983. Schedule L and related schedules attached to OMSB's July 31, 1983, income tax return reflected the book or financial accounting basis of assets for financial statement purposes and not the tax basis of the assets.

After the acquisition, Moore examined the yield, mix, makeup, and maturity of OFB's assets and liabilities, particularly the investment and loan portfolios. Because of the interest-rate risk created by OFB's long-term, fixed-rate assets and its short-term, variable-rate sources of funds, Moore determined that OFB's asset base had to be restructured. Such a restructuring is a standard industry practice for rehabilitating troubled financial institutions.

Moore's board of directors promulgated formal investment guidelines. The maturity dates of certain assets in OFB's investment portfolio exceeded these guidelines. Moore also determined that OFB's real estate loan portfolio had an unacceptable level of interest-rate risk. Moore concluded that it would be necessary to dispose of OFB's long-term, fixed-rate assets and reinvest the proceeds in higher-yield, shorter-term, variable-rate instruments to reduce OFB's interest-rate risk.

During 1983, 1984, and 1985, Moore sold to third parties certain investment assets, mortgages, and real estate loans of OFB. As a result of these sales, Moore claimed losses of $2,601,108, $6,481,259, and $17,614,696 in 1983, 1984, and 1985, respectively. On its consolidated Federal income tax returns for 1984 and 1985, Moore claimed the losses recognized on these sales to offset income generated by other group members. Carrybacks attributable to those losses were also claimed on amended consolidated returns for 1980 through 1983.

OPINION

Section 1.1502-15(a)(1), Income Tax Regs., provides a general rule that built-in deductions, as defined in section

1.1502-15(a)(2), Income Tax Regs., may be used in a consolidated return year only to offset income or gain attributable to the member of the consolidated group that incurred the losses reflected in the built-in deductions. The effect of this provision is to limit the ability of the consolidated group to offset losses of one group member against the income of the other member, particularly when the losses are not incurred during the same taxable year. Section 1.1502-15(a)(2)(i), Income Tax Regs., provides as follows:

(2) *Built-in deductions.* (i) For purposes of this paragraph, the term "built-in deductions" for a consolidated return year means those deductions or losses of a corporation which are recognized in such year, or which are recognized in a separate return year and carried over in the form of a net operating or net capital loss to such year, but which are economically accrued in a separate return limitation year (as defined in sec. 1.1502-1(f)). *Such term does not include deductions or losses incurred in rehabilitating such corporation.* Thus, for example, assume P is the common parent of a group filing consolidated returns on the basis of a calendar year and that P purchases all of the stock of S on December 31, 1966. Assume further that on December 31, 1966, S owns a capital asset with an adjusted basis of $100 and a fair market value of $50. If the group files a consolidated return for 1967, and S sells the asset for $30, $50 of the $70 loss is treated as a built-in deduction, since it was economically accrued in a separate return limitation year. If S sells the asset for $80 instead of $30, the $20 loss is treated as a built-in deduction. On the other hand, if such asset is a depreciable asset and is not sold by S, depreciation deductions attributable to the $50 difference between basis and fair market value are treated as built-in deductions. [Emphasis supplied.]

The emphasized language, i.e., the second sentence of the regulation, is the sentence in dispute in these cases. For convenience, "losses incurred in rehabilitating such corporation" are hereafter referred to as rehabilitation losses. The sentence in dispute has been in section 1.1502-15(a)(2)(i), Income Tax Regs., since 1973. See T.D. 7246, 1973-1 C.B. 381.

Petitioner's primary position in this case is that losses incurred by Moore on sales of assets of OMSB are rehabilitation losses and, therefore, are not built-in deductions within the meaning of the above regulation. In the alternative, petitioner contends that the losses qualify for a de minimis

exception to the built-in deduction rules described in section 1.1502-15(a)(4)(i)(*b*), Income Tax Regs., as follows:

(*b*) Immediately before the group acquired the assets, the aggregate of the adjusted basis of all assets (other than cash, marketable securities, and goodwill) acquired from the transferor or owned by the new member did not exceed the fair market value of all such assets by more than 15 percent.

Respondent contends that the regulation referring to built-in deductions and rehabilitation losses should not be applied literally. Respondent relies on different language in the second sentence of section 1.1502-15(a)(2)(i), Income Tax Regs., prior to the 1973 amendment as follows:

Such term [built-in deductions] does not include deductions or losses incurred both economically and taxwise in a year which is not a separate return limitation year, including those deductions and losses incurred in rehabilitating such corporation. * * *

Respondent's argument is difficult to paraphrase. We therefore incorporate it in haec verba:

The wording of the pre-amendment regulation indicates that the rehabilitating deductions and losses referred to are those which are "incurred both economically and taxwise" after affiliation. The losses realized by Oregon First Bank upon disposition of the assets acquired from Oregon Mutual Savings Bank had economically accrued before affiliation. Therefore, the losses are not rehabilitation losses. The word "including" at the beginning of the second phrase refers to "deductions and losses incurred both economically and taxwise" etc. and not to "[s]uch term." Rehabilitating deductions and losses, then, are not simply exceptions to the built-in deduction definition. The exceptions to the built-in deduction rule are found under subsection (4) and are explicitly labeled "Exceptions."

Respondent's position in this regard was previously stated in General Counsel Memorandum 38,864 (May 24, 1982) (GCM). That GCM, of course, has no precedential value.

Respondent asserts in his reply brief, without explanation, that there is a distinction between OMSB as a mutual savings bank before Moore acquired it and OFB as a commercial bank after the acquisition. The parties stipulated that the agreement between Moore and the FDIC was contingent upon the conversion of OMSB to a State stock commercial bank. Any significance of the distinction is unexplained by respondent and is not apparent from the

evidence. Respondent does not otherwise challenge the evidence concerning the purpose or the effect of the disposition by Moore of the acquired assets of OMSB.

Petitioners argue, and we agree, that the purpose of the disposition of assets, as testified to by the witnesses, set forth in the stipulation, and found by us, constitutes rehabilitation in the normal sense of the word.

The first sentence of section 1.1502-15(a)(2)(i), Income Tax Regs., defines built-in deductions for a consolidated return year as deductions or losses of a corporation recognized or having a tax effect in the consolidated return year but which were economically accrued in a separate return year. The structure of the regulation gives meaning to the second sentence, to wit, built-in deductions do not include losses economically accrued in a separate return limitation year if such losses are rehabilitation losses.

Respondent's argument would render the second sentence of the regulation, which was specifically adopted by the 1973 amendment, redundant or surplusage. There is no reason to refer to rehabilitation losses in the regulation if they are to be treated the same as all other types of losses rather than excluded from the treatment accorded to built-in deductions. The separate listing of exceptions in the separate part of the regulation is not persuasive. The category of rehabilitation losses is in the nature of an exclusion from the definition rather than an exception to the rule.

In *Woods Investment Co. v. Commissioner*, 85 T.C. 274 (1985), we were asked to interpret another section of the consolidated returns regulations, section 1.1502-32, Income Tax Regs. In that case, we concluded that the taxpayer had applied the result mandated by the regulation. We held that the regulation could be amended but otherwise would be applied as written and not rewritten by the Court, even though the result might be anomalous. 85 T.C. at 281-282. In *Woods Investment Co.*, however, we at least understood the difficulty arising from the regulation as written.

Similarly, in *Honeywell, Inc. v. Commissioner*, 87 T.C. 624 (1986), we granted summary judgment in favor of a taxpayer that had applied the literal language of a regulation dealing with reporting of sales of depreciable property.

Respondent argued that the regulation was not intended to cover the situation involved in the case. Nonetheless, we held that respondent's remedy was amendment of the regulation, not a revenue ruling or judicial intervention. 87 T.C. at 635.

In this case, respondent has given us no reason why the result sought by petitioner is inconsistent with the purpose of the regulation or why the regulation should not be applied as written. The alternative interpretation argued by respondent is anomalous in that it would render meaningless a sentence in the regulation. We conclude, therefore, that petitioner is entitled to rely on the regulation as written, that losses incurred in rehabilitating a corporation are not built-in deductions, and that the losses in issue were incurred in rehabilitating a corporation.

Therefore, we need not reach petitioner's alternative argument about applicability of the de minimis exception in section 1.1502-15(a)(4)(i)(*b*), Income Tax Regs.

To reflect the foregoing, concessions by the parties, and issues not discussed in this opinion,

*Decisions will be entered under Rule 155.*